UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


CHARLES BAILEY, CATANZA BAKER,
STACY CASTON, R.J., A MINOR,
BY AND THROUGH HER NATURAL MOTHER
AND NEXT FRIEND, TOMMIECINA JOHNSON;
TOMMIECINA JOHNSON; JOHNITA SMITH; AND
LAQUANA WINTERS                                              PLAINTIFFS


VS.                          CIVIL ACTION NO. 3:16CV256TSL-RHW


ADVANCE AMERICA, CASH ADVANCE CENTERS, INC.;
ADVANCE AMERICA, CASH ADVANCE CENTERS OF
MISSISSIPPI, LLC; EXPRESS CHECK ADVANCE OF
MISSISSIPPI, LLC; TERRENCE ("TERRY") SAUBER;
TONI JONES; and JOHN DOES A, B, C, D and E          DEFENDANTS


<u>MEMORANDUM OPINION AND ORDER</u>

     This cause is cause is before the court on the partial

summary judgment motion of defendants Advance America, Cash

Advance Centers, Inc.; Advance America, Cash Advance Centers of

Mississippi, LLC; Express Check Advance of Mississippi LLC

(collectively Advance America); and Terrence Sauber.  Plaintiffs

Charles Bailey, Catanza Baker, Stacy Caston, R.J., a minor, by and

through her natural mother and next friend, Tommiecina Johnson,

Tommiecina Johnson, Johnita Smith and Laquana Winters have

responded in opposition to the motion.  The court, having

considered the memoranda of authorities, together with

attachments, submitted by the parties, concludes the motion should

be granted in part and denied in part.

Background

Plaintiffs filed this lawsuit alleging claims for assault, unlawful detainment/false imprisonment[1], and intentional infliction of emotional distress, among others, against Terrence Sauber and Advance America[2] relating to events alleged to have occurred on March 19, 2015 at the Express Check Advance branch in Vicksburg, Mississippi, a pay day/title loan business owned and operated by Advance America.  On the afternoon of March 19, 2015, Terry Sauber, a regional loss prevention officer for Advance America, accompanied by Toni Jones, a divisional director of operations for Advance America, went to the Vicksburg store to conduct a loss prevention investigation.  Earlier that day, Sauber had received an email from corporate headquarters expressing concern that over a period of several months, deposits from the Vicksburg store were routinely made two to three days late, suggesting possible impropriety.[3]  Sauber was asked to

_____

[1]    Plaintiffs have alleged separate counts for "false imprisonment" and "unlawful detainment."  Defendants point out that under Mississippi law, these are not separate torts. "Unlawful detention" is the second element of a false imprisonment claim.  See Morgan v. Greenwaldt, 786 So. 2d 1037, 1042 (Miss. 2001)(observing that elements of false imprisonment are "detention of the plaintiff and the unlawfulness of such detention.").

[2]    Plaintiffs have also alleged claims against Advance America for negligent hiring and retention, negligent supervision and training and negligent entrustment.

[3]    According to Jones, company policy required that the day's receipts must be deposited by noon the following day in order to keep the amount of money in the store to a minimum and to

2

investigate.  Sauber promptly contacted Jones to arrange for the two of them to go to the Vicksburg store.  Their plan was to ask the manager if the store was going to balance, that is, if the cash on hand in the store would equal the amount the store's computer records showed should be present.  If the manager said yes, then Sauber and Jones would do a cash count to determine whether all the money was present and accounted for.

When Sauber and Jones arrived at the store, three employees were present, Johnita Smith, Laquana Winters, and Stacy Caston.  The store's "banker," Catanza Baker, was supposed to be there but was out; she was called and told to return to the store, and she did.  Also present at the store were customers Charles Baker and Tommiecina Johnson and Johnson's minor daughter, R.J.  Sauber spoke with the manager, Baker, who stated that the store would balance.  Plaintiffs allege that Sauber then proceeded to "intentionally and unlawfully detain[] [them] by locking the doors to the business and intentionally and unlawfully put[ting] the plaintiffs in fear of eminent, serious bodily harm by exhibiting aggressive and loud behavior."  This went on, according to

---

reduce the temptation to employees of "maybe borrowing the money and paying it back later."  Sauber testified that late deposits can indicate that a store is "floating deposits," meaning an employee withholds some cash from the loan payments received on one day and does not make a deposit for that day, which allows the employee to misuse the cash.  The employee then takes cash from the next day's loan payments and applies that cash to the prior day's receipts and makes a late deposit for the prior day.

plaintiffs, for approximately two hours, while Sauber and Jones did a count of all the money in the store. Ultimately, all the money was accounted for; the store did balance and Sauber left the store.

Defendants have now moved for summary judgment on plaintiffs' claims for false imprisonment/unlawful detainment and assault.

Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). At the summary judgment stage, the court must view the evidence in the light most favorable to the non-movant, and it may not make credibility determinations or weigh the evidence. Abarca v. Metro. Transit Auth., 404 F.3d 938, 940 (5th Cir. 2005); Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Once the moving party shows there is no genuine dispute as to any material fact, the nonmoving party "must come forward with specific facts showing a genuine factual issue for trial." Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist., 635 F.3d 685, 690 (5th Cir. 2011).

False Imprisonment

To succeed on a claim of false imprisonment, a plaintiff must show that she was "detained and (2) that such detainment was unlawful." Mayweather v. Isle of Capri Casino, 996 So. 2d 136, 140 (Miss. Ct. App. 2008). In Martin v. Santora, 199 So. 2d 63 (Miss. 1967), the Mississippi Supreme Court, considering an employee's claim for false imprisonment based on allegations her employer required her to accompany the police to the police station to have her fingerprints taken in connection with a burglary investigation, stated:

> It is essential to a cause of action for false imprisonment that there shall have been some detention or restraint of the person of the plaintiff. ... On the other hand, submission to the mere verbal direction of another, unaccompanied by force or by threats of any character, cannot constitute a false imprisonment, and there is no false imprisonment where an employer interviewing an employee declines to terminate the interview if no force or threat of force is used, and false imprisonment may not be predicated on a person's unfounded belief that he was restrained against his will. In order to constitute an unlawful imprisonment, where no force or violence is actually employed, the submission of the plaintiff must be to a reasonably apprehended force. The circumstances merely that one considers himself restrained in his person is not sufficient to constitute false imprisonment unless it is shown that there was a reasonable ground to have believed defendant would resort to force if plaintiff attempted to assert her right to freedom.

Martin, 199 So. 2d at 65. Thus, plaintiffs can succeed on their claim of false imprisonment only if they present proof that Sauber used "force or violence" to detain them or that they had reasonable grounds for believing he would have used such force to

detain them had they attempted to leave.  See also Nelson v.
Nationwide Mut. Ins. Co., No. 3:11-CV-223-DPJ-FKB, 2012 WL 393242,
at *3 (S.D. Miss. Feb. 6, 2012) ("Detention requires proof that
the defendant employed 'force or violence,' or that the plaintiff
submitted upon 'reasonably apprehended force.'") (citing Martin);
see also Hobson v. Dolgencorp, LLC, 142 F. Supp. 3d 487, 493-94
(S.D. Miss. 2015)(even if employee under questioning by employer
relating to alleged shoplifting was told she could not leave, her
submission "'to the mere verbal direction of another,
unaccompanied by force or by threats of any character, cannot
constitute a false imprisonment....'"); Mayweather, 996 So. 2d at
141 (casino patron's testimony that officer sat in front of door
when she was questioned relating to theft of another customer's
wallet was not enough to show reasonable apprehension of force,
"especially considering that she willingly accompanied security to
the interview room and never attempted to or asked to leave").

    Defendants seek summary judgment on plaintiffs' false
imprisonment claims because they cannot prove that Sauber detained
them.  Plaintiffs maintain that by Sauber's own admission, he
"locked the doors to the building" so that he could "get control
of everything"; this, they say, plainly establishes that he
intended to detain plaintiffs and that he did physically detain
them by locking the doors, and they claim that he then used fear,
intimidation and the prospect of physical force to keep them from

leaving.  They submit that based on Sauber's actions, they had

every reason to believe that he would have used force against them

had they tried to assert their freedom.

Assault

"Assault occurs where a person '(a) ... acts intending to

cause a harmful or offensive contact with the person of the

other or a third person, or an imminent apprehension of such a

contact, and (b) the other is thereby put in such imminent

apprehension.'" Webb v. Jackson, 583 So.2d 946, 951 (Miss. 1991)

(quoting Restatement (Second) of Torts § 21 (1965)).  "An act is

done with the intent of putting the other in apprehension of an

immediate harmful or offensive contact if it is done for the

purpose of causing such an apprehension or with knowledge that, to

a substantial certainty, such apprehension will result." Jordan

v. Wilson, 5 So. 3d 442 (Miss. Ct. App. 2008) (quoting Restatement

(Second) of Torts § 21, cmt. D).  Moreover, the apprehension must

be objectively reasonable.  Thus, for example, the Fifth Circuit

found there was no triable issue of assault in DePree v. Saunders,

588 F.3d 282 (5th Cir. 2009), where the defendant's alleged actions

of "aggressively walk[ing] toward [DePree], yelling at [him],

repeatedly referring to [him] as a 'son-of-a-bitch,' and shaking

papers in his face" could not have created a reasonable apprehension of imminent, harmful contact.  Id. at 291.

Defendants seek summary judgment on plaintiffs' assault claims on the basis that plaintiffs cannot prove that Sauber intended to make harmful or offensive contact with them or that they had reason to believe and actually believed that he intended to have such harmful or offensive contact with them.  Plaintiffs submit that the totality of Sauber's acts and behavior shows that he intended to put them in apprehension of immediate harmful or offensive contact, and he obviously knew that such an apprehension would almost certainly result.

The court, with these legal principles and the parties' arguments in mind, considers the evidence[4] to determine whether any of the plaintiffs has created an issue for trial on either of these claims.[5]

---

[4]     The evidence in this case consists primarily of the testimony of plaintiffs, Sauber and Toni Jones during the criminal trial held in Vicksburg Municipal Court on criminal affidavits for assault filed against Sauber by plaintiffs Baker, Smith, Winters, Caston and R.J., a minor.  Tommiecina Johnson also claimed to have filed a criminal affidavit against Sauber, but no such affidavit could be found and her putative claim was dismissed.  Ultimately, Sauber was found not guilty on all the criminal charges.

[5]     Defendants flatly deny plaintiffs' allegations.  They agree that Sauber locked the door to the building while the money was being counted.  However, both Sauber and Jones testified that the doors were locked as a security measure, not so much to keep people in as to keep others out, since they had large amounts of

<u>Catanza Baker</u>

Catanza Baker was the manager of the Vicksburg Express Check store on March 19, 2015. According to her testimony, when Sauber first arrived, he introduced himself to her, told her he had concerns about the store and asked whether the safe was going to balance. When she said it would, he responded, "Don't lie to me," and proceeded to tell her that if she admitted up front that the safe would not balance, he would set her up on a payment plan, but that if she did not agree to that and her safe did not balance, she would be "leaving out of here in handcuffs today." He then walked to the front of the store, locked the door and placed himself squarely in front of the door with his arms crossed. Baker testified that she felt Sauber "would have did [her] bodily harm" if she had "tried to walk out that door." However, as to the basis for this fear, she offered only that she was "just afraid of his whole demeanor. ... the way he was acting to me, he

---

cash out and plainly visible. Sauber denied that he stood in front of the door, blocking the exit, or that he prevented anyone from coming or going, as necessary; and he denied that he said or did anything threatening or that would have caused any of the plaintiffs to fear he would harm them. Jones similarly testified that while the door was locked, she or Sauber unlocked the door to let employees and customers in or out, as necessary. Sauber, she claimed, did not stand in front of or otherwise block the door, and none of the employees or customers was prevented from leaving. She said, moreover, that Sauber never raised his voice and did not threaten anyone or act in a menacing manner. However, the court, on this motion for summary judgment, is bound to consider the evidence in the light most favorable to the plaintiffs.

was just so aggressive." She testified she did not ask to leave because she was afraid:

> I wasn't going to say anything to Mr. Sauber because he was very hostile. ... He had turned red. His – his whole demeanor – standing up there aggressive. And he had already threatened me that I'm going to jail, so I was too afraid to say anything to him. ... This man was so aggressive with me and he wouldn't let us out that store. I was literally terrified of this man. ... How am I going to approach someone who has already threatened me that if a dime is missing, I'm going to jail and is standing in front of a door, blocking the door where I can't even walk outside.

Baker admitted Sauber never verbally threatened her with physical harm; yet she claimed she felt threatened by

> his whole demeanor – and then when he went and stood by that door – I mean, I'm not going anywhere. Let's say I just wanted to walk outside and get a breath of fresh air, that right was denied me because you're standing – you've not only locked the door, you have stand – stood right in front of the door with your arms crossed in an aggressive manner.

Baker testified that Sauber told them they were not leaving until the money was counted. And while Baker testified that Sauber "would not let me leave of my free will," she admitted she never asked to leave, at least while the money was being counted. She agreed, moreover, that since she was the store manager, she wanted to stay at the store while the money was being counted. Further, she testified that after the money had been counted and everything was accounted for, she asked for permission to leave to take her son to a doctor's appointment and was allowed to leave.

In the court's opinion, Baker's testimony, accepted as true, is insufficient to establish that she was unlawfully detained. Baker does not claim that Sauber used force to detain her; and while she claims that she considered herself detained, that is not sufficient to establish her claim. Rather, she must come forward with evidence which shows that she had an objectively reasonable basis for believing Sauber would have used force if she had attempted to leave. See Martin, 199 So. 2d at 65. Baker's testimony falls short of this standard. Baker admits Sauber never verbally threatened to harm her if she tried to leave. She claims only that she found his "demeanor" to be threatening because he locked the door and stood in front of it with his arms crossed "in an aggressive manner," he "turned red" and was "hostile" – though she does not suggest what specifically made her view him as "hostile." This is insufficient to create a jury issue on Baker's claim that she was unlawfully detained, particularly when considering her further acknowledgment that (1) she wanted to remain at the store while the money was being counted; and (2) when she did ask to leave to take her son for an appointment, Sauber allowed her to go.

Baker's testimony is likewise insufficient to sustain her claim for assault. Nothing in her testimony provides any basis for concluding that she had a *reasonable* apprehension of imminent, harmful contact.

<u>Johnita Smith:</u>

Johnita Smith, though on duty, was not present at the store when Sauber first arrived. When she did return to the store after being called and told to do so, the door was locked. She was let in, and the door was locked behind her. Toni Jones, her district manager, told Smith to immediately count down her register. Smith testified that Sauber stood behind her as she did so. She stated,

> I was nervous. I was shaking. ... He was just standing there looking. He was real red-looking, and you know, he was looking intimid – like – to me, was put me in fear, because he just scared me. His whole face was red, and I didn't really know what was going on.

She stated that after she counted her register down, Sauber was just standing by the door. And she "really wanted to leave, in a sense," because she was nervous and scared; "[b]ut he was standing at the door, like this (indicating) where no one could move. You know, you was like – you couldn't move, you wasn't going to go anywhere ..." Smith testified that she wanted to go get her cell phone to call her family, but her phone was in her purse in the back of the store and Sauber was blocking the exit from her work station. When asked if Sauber said anything to her, she responded,

> Not really. It was more his demeanor, how red he got in the face, how he was just blocking ... the exit and you know, it was – it was – it's how big he was. You know, he was just – I don't know. He was just so – he was just a large man and standing over you and blocking your – your entry way –

12

Asked if she thought he was going to physically assault her, she stated,

> I almost did, because how red he turning in the face.
> ...  I mean, I wouldn't know the reason why if had have,
> but I was just intimidated.  I guess I was just scared.
> ...  I almost thought he could attack me because the way
> ... he got red in his face like that ... [H]e was just
> very red in the face; he was very intimidating.  And
> honestly, I was scared. ... Because I didn't know what
> was going on.

She reiterated this, stating:

> So to me, you know, it was just like I really -- I
> really wasn't -- I really didn't know who he was, you
> know.  I just knew he was a big guy that was standing
> over me and he was red in the face, and I didn't know
> exactly who he was. ....

Smith testified that at the time of this incident, she had been working for Advance America for three years; and during that time, there had been occasions when she had to count the cash in her drawer; but usually, they would take the cash drawer to the back and count it with a manager or someone else being present to verify the count.  As to the events of March 19, 2014, she stated:

> We never did that procedure before.  We never had no one
> to come in, tell you to take out your money right then
> and there, especially, you know, right in front of
> customers there.  We just never did that procedure
> before, and it made me nervous.  It made me scared.  I
> didn't know what was going.

However, she stated that Sauber did not approach her in an aggressive manner; he was "just standing there."  Moreover, she agreed that Sauber and Jones had concerns about deposits that were not being made on time; that the cash count was conducted due to those concerns; that since there were large amounts of cash that

were being counted at the front of the store, then it was reasonable to lock the door as a security measure. She also agreed that her cash count had to be verified, so Sauber had a legitimate reason to stand by her and her co-workers as they were counting their drawers. And she stated that Sauber never said anything to her or approached her in an aggressive manner. What intimidated her and put fear in her, she said, was "the manner that he stood in" and the "aggressiveness" of his manner, i.e., how he was "red in the face" and not speaking in a calm tone. Although she acknowledged that he never threatened to physically harm her, she stated:

> [H]is demeanor made you feel like that. Because the –
> the height, the redness, how he just crossed his arm,
> never said nothing, just looked at you like, "I could
> bite your off [sic] if you move." That's the way I
> felt.

In the court's opinion, no reasonable jury could find defendants liable for false imprisonment or assault based on Smith's testimony regarding the events of March 19, 2015. Smith admitted that Sauber did not use force to keep her in the store and, like Baker, although she asserts rather vaguely that his "demeanor" made her feel that she was at risk of physical harm if she tried to leave, she offered no objectively reasonable ground for a belief that Sauber would have resorted to force if she had attempted to leave. According to Smith, Sauber never said anything to her, threatening or otherwise; all he did was "just stand[] there." The facts that he was a "big guy," that he was

"red in the face," that he stood in front of the door with his
arms crossed, and that she felt intimidated by his manner, is not
enough to sustain her claim for false imprisonment or to support a
finding that she reasonably apprehended imminent, harmful contact
by Sauber, as is essential to her claim for assault.

Laquana Winters

Winters testified that shortly after Sauber arrived at the
store, she went outside with a customer, Tommiecina Johnson, to do
an inspection on Johnson's vehicle. While she and Johnson were
outside, she heard the door lock and saw Sauber turn the "Open"
sign to "Closed." When she finished outside, Sauber opened the
door to let her and Johnson in, and then locked it behind her and
began counting the drawers. Winters testified that she was
"already nervous because we was being locked in the store," but
she was "really scared" because she knew her drawer was $50 short.
When she told Sauber her drawer was going to be short $50, he told
her he was "not worrying about that." After she finished with her
customer, he called her and employee Stacy Caston aside and told
them there was "something fishy going on" but it had nothing to do
with them. Winters testified that when he said this, "[h]e had,
like, this loud aggression." Sauber then called her to the side
to get her to help him count some money; he told her, "Don't ever
let nobody count your money while you're not standing there."
After helping Sauber, Winters returned to her desk, "still, like,
kind of shaking and shivering, because we're still locked in the

15

store," and "nervous" because she did not know "why we got locked in the store." Winters believed that Sauber was "trying to intimidate all the ladies in the store." She stated: "I just feel like he was yelling and hollering at us like we had did something wrong, like we was stealing or we was doing something that we didn't have any business -- and everything was there." When asked whether she feared that she was going to be physically harmed, she responded:

> I didn't -- I didn't -- my mind was -- I'm -- I don't say no physical, but I was really intimidated. I was scared. I was really scared. ... He just was big and aggressive. I didn't know what was going to happen.

Asked if she thought he was going to attack her, she testified:

> I can't say he was going to attack me. I don't know if he would or he wasn't. I just -- it was just -- I was scared. I was really scared. ... I don't know what he was do -- he's a big, aggressive man. If he attack me, if he don't attack me. It's -- I -- I don't know. It's just vice versa, he could attack me, he couldn't attack me.

As to whether he threatened her verbally, she stated:

> He didn't never – well, I'm not going to say he never threatened me verbally. He did tell us that nobody was leaving the store until our money was accounted for.

Winters testified further that she never asked to leave, but that she "didn't feel like [she] had no other choice" than to stay until the money was counted. She agreed, though, this occurred during work hours and it was her job to be there.

Although Winters claimed she was nervous and scared about being locked in the store, and although she described Sauber as a

"big, aggressive man," she did not testify that he detained her by force or that she believed he would harm her if she tried to leave and she did not offer any facts which would support a finding that any such belief would have been objectively reasonable. She also did not purport to have perceived any threat of imminent harmful or offensive contact by Sauber. Accordingly, her claims for false imprisonment and assault fail as a matter of law.

<u>Stacy Caston</u>

Stacy Caston testified that when Sauber arrived at the store, she was working with a customer, Charles Bailey, on reworking a loan. Bailey went outside to get some papers, and while he was gone, Sauber locked the door. According to Caston, Bailey returned to the store and asked to be let back in to finish his business. Sauber let him in, but then "got real aggressive, he was – he had turned red in the face...." Caston stated she "just felt threatened and I feared. I'm like, 'Why are we being locked down?'" Sauber, she testified, said no one could leave until all the money was counted in the store,

> and he propped against the door. So we wasn't allowed
> to leave. And that – I was scared and I feared for my –
> I feared, because – [f]eared for my life, because I
> didn't know what was going on.

Caston stated she thought she was safe as long as she did not try to leave, but, asked whether she thought he was going to attack her if she tried to get out of the door, she responded:

> The way he was looking and the way he propped up at that
> door and, like, wasn't nobody getting out that door,

17

yes.  Yeah, I think he was going to – Yes, he was going
to stop me any means necessary.

Caston acknowledged that all this occurred during her regular work
hours and that during her regular work hours, she stays at the
store.  She further agreed that to stay and count the money was
her job as an employee.  In addition, while Caston testified that
she did not try to leave because she was scared, she acknowledged
that at one point, she did ask Sauber to go outside to do an
evaluation for a customer and was allowed to do so.  She let
herself out, locked the door behind her, did the evaluation and
then let herself and the customer back in with her key.

The evidence does not support a finding that Caston was
assaulted or unlawfully detained.  Caston claimed she "feared for
her life" yet she did not point to anything specific Sauber said
or did to engender such fear.  She testified only that he was
"real aggressive", that he was "propped against the door" and that
he "turned red in the face."  Moreover, she admitted not only that
she felt safe as long as she did not try to leave, but that Sauber
did actually allow her to leave the building.  These facts,
accepted as true, will not sustain a claim for assault or for
unlawful detention.

<u>Charles Bailey</u>

Charles Bailey testified that when he arrived at the Express
Check location on March 19, 2015 to transact business, the door
was unlocked.  He began speaking with Stacy Caston at the counter

18

about a loan.  Shortly after entering the store, Sauber came from the back of the store and locked the door.  Bailey testified that he continued to work with Caston.  At one point, when he needed to go to his vehicle to get his glasses, he asked Sauber to open the door, and Sauber did.  When he got ready to reenter the store, Sauber let him back in.  After Bailey finished handling his business, Caston unlocked the door and let him out.  Sauber then locked the door again and was standing by the door as Bailey drove off.  According to Bailey's testimony, Sauber never said anything to him; and, he was allowed to come and go freely. Clearly, based on this testimony, Bailey has no cognizable claim for false imprisonment or assault.

<u>Tommiecina Johnson</u>

Tommiecina Johnson was a customer in the store doing business when Sauber arrived.  She testified that when she had completed her business and was ready to leave, Sauber was standing in front of the door.  When she told him she was ready to leave, "[h]e was, like, 'You're not going nowhere until all this money accounted for.  And plus, when he (Charles Bailey) leave, that's when you can go.'" Johnson stated she "didn't have no choice" but to stay until the money was counted since "[h]e was standing in front of the door like this...."  She went and sat back down, and left "after two hours."

It is apparent that Tommiecina Johnson has offered no evidence that would even arguably support her claim for assault.

19

In the court's opinion, however, she has presented sufficient evidence that she was detained. Ms. Johnson testified that the door was locked and Sauber was blocking the sole means of egress; and when she asked to be let out, he told her she could not leave. Cf. <u>Mayweather</u>, 996 So. 2d at 140 (finding casino patron was not detained where, although casino security officer was sitting in front of door to the room, patron never asked or tried to leave).

<u>R.J. (a/k/a LJ)</u>

R.J., Ms. Johnson's sixteen-year old daughter, accompanied her mother to the Express Check store on March 19, 2015. She sat listening to music on her headphones while her mother conducted her business. R.J. testified that Sauber came in while she was there with her mother. She testified that she noticed him go to the back of the store, but she had her headphones in, "so I really wasn't paying attention. So I just seen him – he looked all mad and everything, so I didn't really think nothing of it." She stated that when her mother and someone else went outside to take pictures, Sauber locked the door. At that point, she took her headphones off. After her mother came back in the store, she asked her mother what was going on,

> And she was like she don't know. And then I guess my mama asked him can we leave, and he was just saying, "You can't leave until all the money was accounted for." I heard that.

She still did not know or understand what was going on.

20

R.J. admitted that Sauber did not threaten her or say anything to her; he did not even come close to her. Nevertheless, she testified she feared he was going to hurt her because "he was acting all aggressive and yelling, like, 'You can't go nowhere 'til all the money's accounted for.' Then he kept locking the door and standing by the door." Asked again whether he acted like he was going to hurt her, she responded, "Well, the way he was yelling and he was all red in the face and acting all hostile, so I wouldn't know." But she agreed that he was not yelling *at her*.

In the court's opinion, R.J.'s evidence is insufficient to sustain her claim for assault. Sauber never threatened her or even came near her. She could not reasonably have thought she was in danger of imminent offensive contact by Sauber.

As to her claim for false imprisonment, a close question is presented as to whether there is sufficient evidence to support a reasonable finding that R.J. was detained. R.J. testified generally that she was fearful of Sauber because he was yelling and kept locking the door. However, she never asked or tried to leave and she did not indicate that she felt he would have harmed her had she tried to do so. On the other hand, she stated that she was there with her mother and could not leave until her mother left; and while she did not seem to know whether her mother had in fact asked or tried to leave, she did understand Sauber to say that her mother could not leave until the money was counted. She asked her mother why they could not leave, but her mother said she

did not know.  Arguably, one could reasonably find, based on Sauber's statements to her mother, coupled with the fact that he was blocking the door, that she reasonably understood that she was not free to leave.  Therefore, the court will deny defendants' motion for summary judgment on R.J.'s claim for false imprisonment.

Conclusion

Based on all of the foregoing, it is ordered that defendants' motion for partial summary judgment is granted except as to the false imprisonment/unlawful detainment claims of plaintiffs Johnson and R.J.

SO ORDERED this 4th day of August, 2017.


/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE